UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

DOROTHY HAMILTON,                                         :

                                    Plaintiff,           :

                        - against -                      :        **REPORT AND**
                                                                  **RECOMMENDATION**
CAROLYN COLVIN,                                          :        **TO THE HONORABLE**
Acting Commissioner of Social Security,[*]                        **COLLEEN MCMAHON**
                                                        :
                                    Defendant.           :        10 Civ. 9641 (CM) (FM)
----------------------------------------------------------x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED:   7/23/13 |

**FRANK MAAS**, United States Magistrate Judge.

> Plaintiff Dorothy Jean Hamilton ("Hamilton") brings this action pursuant to section 405(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits and supplemental security income.  (ECF No. 2).  The Commissioner has moved, and Hamilton has cross-moved, for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule 12(c)").  (ECF Nos. 16, 18).  For the reasons set forth below, the Commissioner's motion for judgment on the pleadings should be granted, and Hamilton's cross-motion should be denied.

---

[*]      Although Michael Astrue was the original defendant, Acting Commissioner Colvin is automatically substituted pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

I.      Background and Procedural History

On August 15, 2007, Hamilton filed an application for a period of disability, disability insurance benefits, and supplemental security income ("SSI"), alleging that her disability began on June 1, 2006.  (Tr. 78, 93, 123).[1]  In her application, Hamilton claimed that she was unable to work because of, among other things, hypertension, chest pain, osteoarthritis of the knees, and mild depression.  (Id. at 93).  After the Social Security Administration ("SSA") denied Hamilton's application on January 22, 2008, because her condition was found not severe enough to keep her from working, she requested a de novo hearing before an administrative law judge ("ALJ").  (Id. at 13, 49, 50, 55-57).  At the time she requested the hearing, Hamilton also changed the onset date of her alleged disability from June 1, 2006 to August 15, 2007, the last day she had worked.  (Id. at 23, 88, 123).

ALJ Mark Hecht held the requested hearing on December 11, 2008.  (Id. at 13, 20-42).  The sole witness was Hamilton, who was represented by counsel.  (Id. at 13, 21-42).  After the hearing, ALJ Hecht issued a decision on January 23, 2009, in which he concluded that Hamilton had "not been under a disability within the meaning of the [Act] from June 1, 2006 through the date of [his] decision."  (Id. at 13-19).  On February 20, 2009, Hamilton petitioned the Appeals Council for review of the ALJ's decision.  (Id. at 6).  Thereafter, on May 4, 2009, Hamilton submitted "additional evidence" to the Appeals Council consisting of medical records from Lenox Hill Hospital, including two MRI

---

[1]      Citations to "Tr." refer to the certified copy of the administrative record, dated May 5, 2011.  (ECF No. 12).

reports of scans of Hamilton's lumbar spine, dated March 14, 2007 and February 9, 2009, and a report, dated October 28, 2008, concerning the results of an x-ray of her ankles.[2] (Id. at 5, 435-40).  On October 29, 2010, the Appeals Council denied Hamilton's request for review, stating that the additional evidence submitted by Hamilton did not provide a basis for changing the ALJ's decision.  (Id. at 1-2).  The Commissioner's decision became final upon the Appeals Council's denial of Hamilton's request for review.  (Id. at 1-5).

Hamilton commenced this action on December 21, 2010.  (ECF No. 2).  On July 18, 2011, the Commissioner filed his answer, (ECF No. 12), and on October 12, 2011, a motion for judgment on the pleadings.  (ECF Nos. 15, 16 ("Comm'r's Mem.")).  On November 4, 2011, Hamilton filed a cross-motion for judgment on the pleadings.  (ECF Nos. 18, 19 ("Pl.'s Mem.")).  The Commissioner and Hamilton filed further papers, respectively, on November 4 and December 6, 2011.  (See ECF No. 22 ("Comm'r's Reply"); ECF No. 21 ("Pl.'s Reply")).  Both motions consequently are fully submitted.

The issue presented by the motions is whether the ALJ's determination that Hamilton was not disabled within the meaning of the Act from June 1, 2006, to January 23, 2009, is legally correct and supported by substantial evidence.

---

[2]     The March 2007 MRI report actually already had been considered by the ALJ. (See id. at 372-73).

II.    Relevant Facts

    A.    Nonmedical Evidence

        Dorothy Hamilton was born on July 8, 1955, in New York City.  (Tr. 24).

She is a high school graduate who is married and has two children.  (Id. at 24-26).

Hamilton's first and only job was from July 2000 to May 2005, when she worked as an

application clerk for the New York City Department of Citywide Administrative Services

("DCAS").  (Id. at 26-29, 94).  As part of the job, Hamilton provided applications to

persons seeking employment, which required her to sit at a desk most of the day and

occasionally lift or carry papers; she was not required to handle or move large or heavy

objects.  (Id. at 26-27, 94).  After being laid off in May 2005, Hamilton returned to work

briefly from September to December 2006.  (Id. at 27-28, 94).  At the hearing, Hamilton

conceded that she would have continued working as an application clerk had the job not

"ended."  (Id. at 27-28).

        On August 15, 2007, Hamilton filed an application for disability.  Included

in Hamilton's application for disability benefits were her responses to questionnaires and

several reports, including a Function Report dated September 20, 2007, (id. at 101-08),

and a Disability Report, (id. at 92-100).  Hamilton reported that around June 1, 2006, she

began suffering from constant back pain that greatly reduced her mobility and prevented

her from completing everyday tasks.  Specifically, she reported that back pain prevented

her from (1) bending over (causing her to have trouble negotiating the bathtub and getting

dressed); (2) climbing stairs without extreme difficulty; (3) reaching for items; (4) lifting

her arms (causing difficulty when she showered and brushed her hair); (5) sitting on the toilet; (6) standing or walking for lengthy periods; (7) climbing stairs; and (8) carrying items that weighed more than ten pounds, such as groceries.  (Id. at 39, 102-04, 106-08, 122).  Hamilton further reported that she could prepare meals on a daily basis, but was unable to cook large holiday dinners without help.  (Id. at 103).  She also could do the laundry and iron, but could not bend over, which caused difficulty taking clothes out of the laundry.  (Id. at 104).

Hamilton reported back pain so persistent and severe that she was unable to sleep through the night and often experienced difficulty concentrating and remembering things.  (Id. at 102, 108).  In addition to back pain, Hamilton claimed that she suffered from hyperlipidemia, hypertension, chest pain, mitral valve prolapse, palpitations, mild depression, bilateral hip pain, and headaches, which further prevented her from performing work-related activities.  (Id. at 93, 111-12, 119; see id. at 30-37).  She indicated that she had headaches at least five to eight times per day, causing her to feel dizzy and lightheaded and like she might faint.  (Id. at 111-12).

Hamilton indicated that she had been prescribed several medications to manage her pain and other symptoms, including amlodipine, aspirin, calcium, famotidine, hydrocodone, isosorbide, oxycodone, Diovan, Toprol, and Vytorin.  (Id. at 98, 121; see id. at 30-35).  Hamilton had no difficulty eating, taking medication, or attending scheduled doctor's appointments.  (Id. at 102).  She further testified at the hearing that she

was able to take public transportation to go to the doctor's office, but had to take a bus

because she was unable to travel by subway.  (Id. at 25; see id. at 104).

      B.     Medical Evidence

           1.     Dr. M. Shuja

On December 17, 2005, Dr. M. Shuja, a physician at Bronx Lebanon

Hospital, examined Hamilton, reviewed her medical history, and completed a Federal

Employment and Guidance Services ("F.E.G.S.") Health and Human Services medical

report.  (Id. at 125-28).

In the report, Dr. Shuja diagnosed Hamilton as suffering from hypertension,

hyperlipidemia, chest pain, palpitation, osteoarthritis in her knee joints, and mild

depression.  (Id. at 125).  He further found that she had a history of mitral valve prolapse

and paroxysmal atrial fibrillation.  (Id.).  Dr. Shuja based his diagnoses on his physical

examination of Hamilton, during which he noted various impairments to her

cardiovascular, gastrointestinal, musculoskeletal, and emotional and psychiatric systems.

(Id. at 128).  Dr. Shuja noted that she suffered from knee pain with mild restrictions in her

knee joint's range of motion.  (Id.).  The results of her physical exam at that time were

otherwise normal.  (Id.).  Dr. Shuja's report indicated that Hamilton scored a 19 on her

previous PHQ-9 screening questionnaire, which was in the "[m]oderately severe

depression" range.  (Id. at 127).  Hamilton reported that her current medications, as of

December 15, 2005, included Zocor, Toprol, Norvasc, Diovan, Protonix, aspirin, and

nitroglycerin.  (Id. at 126).  Dr. Shuja recommended that she see her primary care

physician to treat her hypertension, hyperlipidemia, and osteoarthritis, and that she see a psychiatrist to address her depression.  (Id. at 125).

A F.E.G.S. Biopsychosocial Summary completed a few days later, on January 5, 2006, indicated that Hamilton had complained of chest pains and expressed a need for open heart surgery.  (Id. at 129, 131, 134).  Hamilton again complained of depression, but refused outpatient treatment.  (Id. at 133-34).  According to the Summary, Hamilton told a F.E.G.S. social worker that she was able to perform "light" household chores, including sweeping, mopping, vacuuming, making the bed, washing dishes, and doing laundry.  (Id. at 135).  Hamilton also reported that she was able to bathe, prepare meals, get dressed, groom herself, socialize, read, listen to music, and go to the movies. (Id.).  She reported continued health problems, including chest pains, shortness of breath, high blood pressure, high cholesterol, pain in her feet and thighs, and gastric reflux.  (Id. at 131, 135).

2.      Dr. William Priester

On May 8, 2007, Dr. William Priester, M.D., examined Hamilton to evaluate her chest pain and shortness of breath, including a "burning sensation" that reportedly lasted several minutes.  (Id. at 145).  Dr. Priester noted that Hamilton's symptoms occurred "occasionally but not consistently with exertion," which he considered somewhat atypical.  (Id.).  At the time of the evaluation, Hamilton's blood pressure was 122/80, she had a regular heart rhythm with a rate of 64, and an

electrocardiogram ("EKG") stress test "demonstrated sinus rhythm with left ventricular hypertrophy, nonspecific IVCD, and ST-T abnormalities."  (Id.).

Dr. Priester performed an echocardiogram, which revealed "thickened mitral leaflets with prolapse and mild regurgitation," as well as "mild left ventricular hypertrophy with an ejection fraction of 70%."  (Id. at 145, 148).  Although Hamilton exhibited "mild mitral regurgitation due to mitral valve prolapse," Dr. Priester did not believe that this would "develop into a significant medical problem."  (Id. at 145). Nevertheless, he "advise[d] her to take prophylactic antibiotics prior to dental appointments."  (Id.).  Examining her heart, Dr. Priester observed that the "S1 and S2 were normal" and that there was a "systolic holosystolic murmur at the apex," although there was "no peripheral edema."  (Id.).  Dr. Priester further noted that Hamilton had three significant risk factors for ASCAD (Atherosclerotic Coronary Artery Disease): hypertension, high cholesterol, and cigarette smoking.  (Id.).  In light of these risks, he recommended that she undergo another stress test two days later after not taking her beta-blocker and follow up with an echocardiogram in two or three years.  (Id.).

Following Dr. Priester's suggestion, Hamilton had another stress test on May 15, 2007.  (Id. at 149-53).  During this examination, Hamilton "exercised for 2 minute[s] 39 seconds into Stage II for a total of 5 minutes 39 seconds at a peak workload of 6.6 METS."  (Id. at 149).  Hamilton's heart rate reached as high as 148, but Dr. Priester had to stop the test because Hamilton complained of exhaustion and pain in her right thigh and hip, as well as mild "burning" in her chest.  (Id.).  Dr. Priester noted a

distinction between the control EKG, which "demonstrated sinus rhythm" and was "within nonspecific ST-T abnormalities," and peak exercise, which showed a ".9 mm horizontal ST segment depression" with an "unremarkable" recovery period.  (Id.).  He reported that the "[m]aximal EKG stress test suggest[ed] ischemia."  (Id.).

3.     Dr. Eugene Pasquale

Hamilton underwent a thallium stress test conducted at Lenox Hill Hospital by Dr. Eugene Pasquale, M.D., on September 13, 2007.  (Id. at 332).  This examination revealed normal results.  (Id.).  Specifically, Dr. Pasquale found "[n]either ST segment depression nor cardiac arrhythmias . . . during the exercise or recovery periods."  (Id.).  He further observed no evidence of "stress-induced myocardial ischemia."  (Id.).  Dr. Pasquale also reported "normal resting ventricular wall motion and thickening," and "normal left ventricular ejection fraction."  (Id.).

4.     Dr. Jane A. Lee

On March 14, 2007, Hamilton underwent an MRI scan of her lumbar spine at Lenox Hill Hospital.  (Id. at 372-73).  Dr. Jane A. Lee, the attending radiologist, determined that Hamilton had "mild bilateral facet and ligamentous hypertrophy" and "mild to moderate bilateral foraminal narrowing" at the L4/L5 level.  (Id. at 372).  Dr. Lee further found a "L5/S1 minimal diffuse disc bulge contacting the left L5 exiting nerve root," and a "L3/L4 mild degenerative change of the facet minimally contacting . . . the left L3 exiting nerve root."  (Id. at 373).

9

Despite these findings, Dr. Lee found "no evidence of . . . focal disc herniation" at the L4/L5 level and determined that the "bilateral exiting nerve roots appear[ed] within normal limits." (Id. at 372).  There also was "no evidence of focal disc herniation" at the L3/L4 level. (Id. at 373).  Dr. Lee further found that the "remaining levels demonstrate[d] no evidence of focal disc herniation or spinal canal stenosis." (Id.).  Dr. Lee also determined there was "normal curvature" of Hamilton's "lumbar lordosis," and that the "vertebral bodies" were of "normal height and configuration," the "intervertebral disc spaces" were "within normal limits," and the "conus terminate[d] at the L1 level and demonstrate[d] no evidence of abnormal signal changes." (Id. at 372).

5.     Dr. Marcelo Rubinsky

On June 15, 2007, on a referral from her treating physician, Dr. Richard Rho, Hamilton went to the Manhattan Eye, Ear and Throat Hospital ("MEETH"), where she was evaluated by Dr. Marcelo Rubinsky for a possible epidural steroid injection. (Id. at 374, 386).  Hamilton complained of pain in her back and right buttock, pain and numbness on the lateral side of her thigh down to the knee, and ankle pain. (Id.).  She rated the pain as a 9 out of 10 on a 10-point scale. (Id.).  At the time, she was taking several medications, including OxyContin 10/325 every six hours, as needed, for pain. (Id.).  After evaluating Hamilton, Dr. Rubinsky gave her the injection. (Id.).

Hamilton returned to MEETH on June 27, 2007, for an additional lumbar spine injection into the "superior aspect of the L4-L5 foramina." (Id. at 368).  Dr.

Rubinsky directed that she "limit [her] activities for the next twenty four hours" and "not engage in any strenuous activity" immediately after the injection.  (Id. at 375).

On August 6, 2007, Hamilton received a third epidural steroid injection. (Id. at 359).  She indicated that the prior injections had afforded her no relief and that the pain was worse.  She also reported she was in physical therapy to help alleviate the pain. (Id.).  Hamilton rated her pain as a 10 on a 10-point scale.  (Id.).  Dr. Rubinsky performed the injection at the "L5-S1 interspace."  (Id. at 357).

On September 18, 2007, Dr. Rubinsky gave Hamilton yet another epidural steroid injection, this time under x-ray guidance at the L5-S1 level on the right.  (Id. at 339).  Dr. Rubinsky's preoperative diagnosis noted that Hamilton suffered from "[l]ow back pain secondary to herniated nucleus pulposus at L5-S1 on the right."  (Id.). Following the procedure, Hamilton was "discharged in good condition."  (Id.).  Dr. Rubinsky again directed Hamilton to "return home directly after [her] discharge" from MEETH and to "limit [her] activities for the next twenty four hours" and avoid engaging in "strenuous activity."  (Id. at 344).

      6.    Dr. Richard Rho

On October 21, 2008, Dr. Richard Rho, Hamilton's treating physician, completed a "Questionnaire as to Residual Functional Capacity: Physical Impairment" in connection with her disability claim.  (Id. at 429-34).  According to Dr. Rho's report, Hamilton was able to stand and sit for less than an hour in an eight-hour workday.  (Id. at 431).  She could walk only two to four blocks without stopping, and was able to lift up to

ten pounds, but could not carry more than five pounds.  (Id. at 431-33).  Dr. Rho reported that Hamilton had trouble bending, squatting, kneeling, and turning, but no problems using her extremities in a normal range of motion.  (Id. at 431).  He indicated that she could use her hands for fine manipulation, and grasp, push, or pull less than ten pounds with either hand.  (Id. at 432).  Additionally, she could travel by bus, but not by subway.  (Id. at 433).

Based on his monthly sessions with Hamilton and her MRI results, Dr. Rho diagnosed lower back pain, secondary to lumbar disc herniation and lumbar radiculopathy.  (Id. at 429-30).  In arriving at his diagnoses, Dr. Rho relied on the March 2007 MRI, which indicated that Hamilton suffered from a herniated nucleus pulposus (HNP) at the L4-L5 disc level.  (Id.).  Dr. Rho prescribed 80 mg of OxyContin every twelve hours for pain.  He also recommended epidural steroid injections, physical therapy, nonsteroidal anti-inflammatory drugs, and Prednisone.  (Id. at 430).  By checking a box on the questionnaire, Dr. Rho indicated that the medications prescribed for Hamilton had no side effects and did not limit Hamilton's activities.  (Id. at 430).  He opined that her condition, which he described as "lumbar disc herniation with nerve root compression," could reasonably be expected to produce her alleged pain, concluding that this impairment lasted, or could be expected to last, at least twelve months, and that her prognosis was "guarded."  (Id. at 430-31).

7.     Dr. Jean-Paul Dym

On February 9, 2009, Dr. Jean-Paul Dym, M.D., the attending radiologist at Lenox Hill Hospital, reviewed an MRI scan of Hamilton's lumbar spine.  (Id. at 436-37).  Hamilton submitted Dr. Dym's report after ALJ Hecht issued his decision, but before the Appeals Council denied her request for review.  (Id. at 4, 435-40).  Dr. Dym determined that Hamilton's "vertebral bodies" appeared "normal in height and alignment," her "vertebral body bone marrow [was] normal in signal," and her intervertebral disks [were] maintained in height."  (Id. at 436).  Her "visualized paraspinal soft tissues" also were "unremarkable."  (Id.).  Although Dr. Dym identified "tiny disk bulges at T10-11, T11-12, and T12-L1," there was "no associated cord compression or foraminal stenosis."  (Id.).

With respect to Hamilton's lumbar region, Dr. Dym found the L1-2 disk level to be "unremarkable."  (Id.).  He determined that the L2-3 level had a "tiny disk bulge with mild facet joint and ligamentous hypertrophy result[ing] in minimal canal stenosis."  (Id.).  Similarly, at the L3-4 level, he found minimal canal stenosis with "moderate left and mild right foraminal stenosis."  (Id.).  At L4-5, he found "mild to moderate bilateral foraminal stenosis," and at L5-S1, he observed "moderate left foraminal stenosis," but "no significant canal stenosis."  (Id. at 437).  Although Dr. Dym's impression was that Hamilton had a degenerative disc disease, his comparison of the March 2007 and February 2009 MRI results revealed no significant interval change.  (Id.).

13

8.    Physical Therapy

Hamilton began physical therapy at Hands-On Physical Therapy in July 2006 to treat her back pain.  (Id. at 155-56; see id. at 155-330).  Between July 2006 and August 2007, she received treatment as often as three times per week.  (Id. at 156-69).  The long-term goals of the physical therapy included achieving no pain in her back (i.e., a rating of 0 on a 1 to 10 scale), a 5/5 rating for muscle strength, and negative results on a straight leg raise test.  (Id. at 179-82).  In January 2007, Hamilton's physical therapist rated her muscle strength at 2/5, and noted that she had difficulty ambulating and walking up and down stairs.  (Id. at 171, 175, 179, 183, 190, 194, 197).  At that time, her straight leg raise test was positive, and Hamilton complained of pain at a level of 5 on a 10-point scale.  (Id.).  She exhibited similar results the following month.  (Id. at 199, 202, 205, 208, 211, 213, 216, 219).

On February 23, 2007, Hamilton reported improved mobility and decreased back pain.  (Id. at 202).  By the middle of March 2007, the treatment appeared to be having an effect, as Hamilton's strength and function improved, and she experienced a further decrease in pain.  (Id. at 251).  The results of her straight leg raise test were negative, and her muscle strength was measured at 3/5 and 3+/5.  (Id. at 223, 228, 231, 234).  Her pain levels fluctuated, however, and there were times when her pain increased.  On March 27, 2007, for example, Hamilton rated her pain level as 7/10.  (Id. at 254).  She further complained of difficulty sleeping at night.  (Id. at 244, 247, 249, 252, 255).

14

By the middle of April 2007, Hamilton's muscle strength was at 3/5 and her pain appeared to decrease, at least initially, to a level of 5 out of 10.  (Id. at 257).  Nonetheless, she continued to have difficulty ambulating and sleeping at night.  (Id. at 257, 258, 260, 263, 270).  By the end of April, her muscle strength had improved significantly, to a rate of 4-/5, but she still complained that she was unable to achieve normal waking position and could maintain a sitting position for no more than twenty-five minutes.  (Id. at 272).

In May 2007, Hamilton continued her physical therapy, but reported difficulty negotiating stairs and an increase in pain associated with prolonged walking.  Manual muscle testing of her capacity for forward flexion and extension both were rated as 4-/5, and her general pain level decreased to 4/10.  Hamilton's therapist noted that her progress toward her goal and her tolerance to treatment both were good.  (Id. at 276; see id. at 281, 293, 297, 300).

Through June and July 2007, Hamilton's pain continued to decrease, ultimately reaching a level of 3/10.  Her muscle strength increased to 4/5, though the results of her straight leg raising test remained positive.  (Id. at 272, 290, 304, 307-08, 310).  Her gait, posture, sensation, reflex, and palpation testing remained normal throughout July.  (Id. at 216, 251, 263, 279, 290, 320).  Despite her improvement, she still reported that it was difficult to sit for more than twenty-five minutes, lean over, move between the bed and chair, and find a comfortable position.  (Id. at 310, 319).  On August 29 and August 31, 2007, Hamilton reported pain in her right low back and buttock,

especially when she was seated.  Her straight leg raising test was negative, however, and she continued to rate her pain at a level of 3/10.  (Id. at 325-26, 328-29).

        9.    Dr. Joseph Kohn

Dr. Joseph Kohn, M.D., of Industrial Medicine Associates, P.C., conducted a consultative internal medicine examination of Hamilton on October 19, 2007.  (Id. at 392-97).  He noted that Hamilton complained of high blood pressure and cholesterol, gastroesophageal reflux, mitral valve prolapse, constant chest pain that had recently changed to sharp precordial chest pain radiating to her right shoulder, occasional dizziness, sweating, and shortness of breath.  (Id. at 392).  Hamilton told Dr. Kohn that she had been hospitalized about five times for chest pain at Mt. Sinai and Lenox Hill Hospitals, and that her last hospitalization had been at Lenox Hill Hospital, just one month prior, for chest pain, dizziness, and headaches.  (Id.).  Hamilton complained of consistent back pain which she said was helped temporarily by her medication.  (Id.).

Hamilton noted that, despite her dizziness, headaches, and fear that she would pass out on the subway, she never had lost consciousness.  (Id.).  She further reported that she suffered from swelling of the feet and blurred vision, could not stand for more than half an hour because of the pain in her back and hips, and could not sit for long periods for the same reason.  (Id. at 393).  Dr. Kohn noted that Hamilton had smoked up to six cigarettes per day for more than twenty years.  (Id.).

Hamilton reported that she was able to shower and dress herself, and did her own cooking and shopping with her son, who also helped her clean and launder clothes

because of her inability to bend over and her aching hands.  (Id. at 393-94).  Hamilton

told Dr. Kohn that she was on several medications, including Toprol, Vytorin, aspirin,

Diovan HCT, Isosorbide Mononitrate, Oxycodone with Tylenol, Pepcid, calcium,

Vitamin D, and nitroglycerin.  (Id. at 393).

        According to Dr. Kohn's report, Hamilton was obese, but had no acute

distress and displayed a normal gait.  (Id. at 394).  She was able to walk on her heels and

toes without difficulty, and able to squat fully; she used no assistive devices, and did not

require any help changing for the exam or getting on or off the examination table.  (Id.).

Dr. Kohn found her ears, nose, throat, and teeth to be normal, and found no masses in her

neck.  (Id.).  Hamilton's chest had normal percussion, no significant abnormality in the

chest wall, and normal diaphragmatic motion.  (Id.).  Although Dr. Kohn found a 2/6

systolic murmur at the apex of her heart, radiating to the aortic focus, her heart rhythm

was regular.  (Id.).  Despite her complaints of back pain, Hamilton's "cervical spine" and

"lumbar spine" showed "full flexion, extension, lateral flexion bilaterally, and full rotary

movement bilaterally."  (Id. at 395).  She also did not suffer from "scoliosis, kyphosis, or

abnormality in [her] thoracic spine."  (Id.).

        Dr. Kohn examined Hamilton's extremities and joints, finding a full range

of motion in her shoulders, elbows, forearms, wrists, hips, knees, and ankles, bilaterally.

(Id.).  She had full strength in her upper and lower extremities, "no evident subluxations,

contractures, ankylosis, or thickening," and joints that appeared "stable and nontender."

(Id.).  He noted the existence of a "congen[ital] fleshy mass at the sole of the right foot,"

17

but found "no cyanosis, clubbing, or edema."  (Id.).  An x-ray of Hamilton's lumbar spine

showed a straightening of her lumbar lordosis.  (Id.; see id. at 397).

Dr. Kohn diagnosed Hamilton with hypertension and high cholesterol by

history, mitral valve prolapse by history, gastroesophageal reflux by history, and a heart

murmur of "unclear importance."  (Id. at 396).  He further diagnosed her with chest pain

by history of an unclear cause, for which he recommended she undergo a stress test, back

and leg pain by history, headaches and dizziness by history, obesity, and vision problems

by history.  (Id.).  Although Dr. Kohn determined Hamilton's prognosis was guarded, he

concluded, based on his evaluation, that she had no restrictions.  (Id.).

10.    Psychological Evaluations by Dr. Rita Haley and Dr. R. Nobel

At the request of the New York State Division of Disability Determinations,

Hamilton underwent a psychiatric evaluation by Dr. Rita Haley, Ph.D., a consultative

examiner, on October 19, 2007.  (Id. at 387-91).  (Id. at 387).  Hamilton explained to Dr.

Haley that she was unable to work because of back and chest pain, headaches, and an

inability to walk up steps or bend over.  (Id.).  Hamilton also said that she was admitted to

the emergency room of Lenox Hill Hospital in 2007 for chest pain, dizziness, and

headaches, but that the hospital found no physical problems that would cause such

symptoms.  (Id.).  Hamilton further reported that her medical problems included "high

[blood pressure], high cholesterol, gastroesophagal reflux, mitral valve prolapse, chest

pain, back pain, pain on [the] right side of [her] hip and thigh, headaches, dizziness, [and

that her] whole body ache[d], her feet [were] swollen, she ha[d] problems walking up

steps, [could] not stand for too long or sit for too long, and ha[d] blurred vision." (Id.). Hamilton told Dr. Haley that her medications included Toprol-XL, Vytorin, Diovan HCT, Isosorbide Mononitrate, Oxycodone, Pepcid, and nitroglycerin. (Id.).

Hamilton expressed concern that she is "might fall . . . in the streets or on the train" because of "blurred vision, headaches, and dizziness." (Id. at 388). Hamilton also explained that she felt nervous on trains "because she was downtown on 09/11." (Id.). Hamilton reported that she had trouble falling asleep and would wake up three times each night, that she had gained weight because of her increased appetite, and that she often suffered from fatigue, muscle tension, and flashbacks. (Id.).

Dr. Haley noted that Hamilton was cooperative during the evaluation and had an adequate manner of relating. (Id.). Hamilton's speech was "fluent and clear" and her thought processes were "current and goal directed," although her affect was "dysphoric," and her mood "dysthymic." (Id.). Hamilton had a clear sensorium, her attention, concentration, and recent and remote memory were intact, and she had good insight and judgment, as well as average cognitive functioning. (Id. at 389). Hamilton told Dr. Haley that she was able to care for her personal needs, cook, shop, and manage her own money. (Id.).

Dr. Haley found that Hamilton could "follow and understand simple directions, perform simple tasks independently, maintain attention and concentration, . . . learn new tasks, perform complex tasks, make decisions and relate adequately with others." (Id.). According to Dr. Haley, Hamilton also could maintain a regular schedule,

although her pain made this somewhat difficult.  (Id.).  Although Dr. Haley determined that Hamilton could not "appropriately deal with stress" and had some psychiatric problems, she opined that these issues did "not appear to be significant enough to interfere with [her] ability to function on a daily basis."  (Id.).  Dr. Haley diagnosed Hamilton with "anxiety disorder;" although she could not specify which disorder, she was able to rule out post-traumatic stress disorder.  (Id. at 390).  She recommended that Hamilton undergo "psychiatric intervention."  (Id.).

On November 14, 2007, Hamilton's record was examined further by Dr. R. Nobel, a consulting psychologist.  After reviewing the record, Dr. Nobel concluded that, although Hamilton suffered from an anxiety-related disorder, her impairment was "not severe."  (Id. at 398; see 398-411).

C.    ALJ Decision

ALJ Hecht issued a decision on January 23, 2009, in which he concluded that Hamilton was not disabled during the relevant period, which commenced with the alleged onset date of June 1, 2006, and ran through the date of his decision.  (Id. at 13-19).

Beginning his analysis with Step One of the required five-step sequential analysis, ALJ Hecht determined that Hamilton had not engaged in substantial gainful activity since the alleged onset date.  (Id. at 15).  At Step Two, the ALJ concluded that Hamilton had "severe impairments" within the meaning of the Act, including "[h]igh blood pressure, chest pain, heart palpitations, knee pain, depression, back pain, and

headaches." (Id.). At Step Three of the analysis, ALJ Hecht found that Hamilton's

medically determinable impairments did not "meet[] or medically equal[] one of the listed

impairments" in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Appendix 1"). (Id.).

Although the ALJ observed that Hamilton had restrictions of activities in her daily living,

difficulties in maintaining social functioning, and difficulties in maintaining

concentration, persistence, or pace, he determined that these limitations were all mild to

moderate. (Id. at 16). Further, the ALJ found no episodes of decomposition. (Id.).

Because the ALJ found Hamilton's mental impairments to lack "at least two 'marked'

limitations" or, alternatively, "one 'marked' limitation and 'repeated episodes' of

decompensation, each of extended duration," he concluded that the criteria for the

impairments in Paragraph B of Appendix 1 were not satisfied. (Id.). Similarly, he found

that the evidence submitted "fail[ed] to establish the presence of the 'paragraph C'

criteria." (Id.).

       At Step Four of the analysis, ALJ Hecht assessed Hamilton's residual

functional capacity ("RFC"), finding that she had the RFC to "perform the full range of

sedentary work," as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), because she

could "sit for 6 hours and stand [or] walk for 2 hours in an 8-hour workday," and "lift [or]

carry 10 pounds." (Id.). He consequently determined that she was "capable of

performing [her] past relevant work as an [a]pplication [c]lerk" because that position

"require[d] sitting for most of the time in an 8-hour workday" and did not necessitate that

she "lift [or] carry anything as part of her duties." (Id. at 19). In short, the ALJ

determined that Hamilton's former job as an application clerk did "not require the performance of work-related activities precluded by" her RFC and, therefore, she was not disabled under the Act.  (Id. at 19).

In reaching this conclusion, ALJ Hecht reviewed Hamilton's medical and nonmedical history, including her hearing testimony.  (Id. at 16).  Utilizing this information, he followed a two-stage process, in which he first "determined whether there is an underlying medically determinable physical or mental impairment . . . that could reasonably be expected to produce [Hamilton's] pain or other symptoms," and then "evaluate[d] the intensity, persistence, and limiting effects of [Hamilton's] symptoms to determine the extent to which they limit[ed her] ability to do basic work activities."  (Id. at 16-17).

With respect to the first stage, the ALJ noted that the progress reports completed by Hamilton's physical therapist indicated that her condition had improved as a result of the therapy.  (Id. at 17; see id. at 154-330).  Specifically, in January 2007, after several months of therapy, Hamilton's physical therapist reported that Hamilton had a "normal gait with no postural deviations or abnormal reflexes," and the March 2007 MRI scan evaluated by Dr. Lee showed "only minimal abnormalities including mild degenerative changes at L3-4 and minimal diffuse disc bulging at L5-S1."  (Id. at 17; see id. at 175-201, 372-73).  ALJ Hecht found it significant that notes taken by Hamilton's physical therapist during examinations in June and August 2007 revealed progress and reflected no abnormalities, although he acknowledged that Hamilton received several

22

epidural steroid injections at MEETH to treat her low back pain during this time period. (Id. (citing id. at 288-91, 304-09, 325-30, 377-86)).

Although the EKG evaluated by Dr. Priester in May 2007 showed "some mild abnormalities," ALJ Hecht emphasized that a physical examination revealed "a regular heart rhythm and no edema," and "a follow-up exercise stress test, performed in September 2007, was completely normal." (Id. at 17 (citing id. at 142-53, 331-32)). Additionally, although Hamilton complained that she suffered from depression and scored within the "severely depressed range" on the PHQ-9 test, the ALJ did not give this result significant weight because that "questionnaire relie[d] on self-report and was not a clinical diagnosis." (Id. at 17; see id. at 126-27, 134).

ALJ Hecht also noted the October 2007 consultative examinations of Drs. Haley and Kohn, which revealed no severe abnormalities. (See id. at 17-18). As the ALJ observed, Dr. Haley found that Hamilton "exhibited normal speech and thought processes," and concluded that her existing mental problems "did not appear to be significant enough to interfere with her ability to function on a daily basis." (Id. at 17 (citing id. at 387-91)). Similarly, Dr. Kohn "found no abnormalities in any body system," and concluded that Hamilton "had full range of motion in the lumbar spine and a regular heart rhythm." (Id. at 17-18; see id. at 394-95). ALJ Hecht further observed that, with the exception of "some straightening of the lumbar lordosis," Dr. Kohn had determined that an x-ray of Hamilton's lower spine was normal, and that she "had no physical restrictions." (Id. at 18 (citing id. at 392-97)).

The ALJ considered Dr. Rho's[3] October 2008 diagnosis of "lumbar disc herniation," but found it important that the record contained no evidence of an MRI having been taken since March 2007.  (Id. at 18 (citing id. at 428-34)).  Although Dr. Rho concluded that Hamilton's prognosis was "guarded" because he found she could not sit or stand for even one hour "in an 8-hour workday," ALJ Hecht noted that "this opinion [was] contradicted by the other medical evidence in the record."  (Id. at 18).  The ALJ also considered it noteworthy that, despite Dr. Rho's statement that he had seen Hamilton monthly, the record did not contain any records of such treatment.  (Id.; see id. at 428-34).

ALJ Hecht noted that the opinions of Dr. Rho, Hamilton's treating physician, and Drs. Haley and Priester, the consultative physicians, were not consistent. (Id. at 18; see id. at 142-53, 387-91, 428-34).  The ALJ chose to give "great weight" to the objective medical evidence, ultimately concluding that his RFC finding was supported by "the objective medical evidence from Dr. Priester, the consultative physicians, the diagnostic tests[,] and [Hamilton's] own testimony and statements regarding her daily functioning."  (Id. at 18).

Although ALJ Hecht found at the first stage of Step Four that Hamilton's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," (id. at 18),  at stage two of Step Four, he concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not

---

[3]      ALJ Hecht mistakenly referred to Hamilton's treating physician as "Dr. Rowe," rather than Dr. Rho.  (Id. at 18).

credible to the extent they [were] inconsistent with" the RFC.  (<u>Id.</u> at 18).  In that regard, the ALJ emphasized that, although Hamilton alleged that she was unable to complete daily tasks, some of her "statements to the medical sources contradict[ed] these allegations." (<u>Id.</u>).

Specifically, although Hamilton stated that her back and hip pain prevented her from walking up stairs, bending over, or standing or sitting for extended periods of time, she told Dr. Kohn that she cooked on her own and used public transportation, and she told Dr. Haley that she was able to care for her personal needs, cook, and shop.  (<u>Id.</u> at 18; <u>see id.</u> at 389, 393-94).  The ALJ identified additional inconsistencies, finding it significant that Hamilton complained of chest pain and breathing problems, yet continued to smoke cigarettes.  (<u>Id.</u>; <u>see id.</u> at 93, 393).  Further, while Hamilton claimed to be nervous and depressed, the ALJ noted that there was "no evidence of any mental treatment for her symptoms." (<u>Id.</u>).  ALJ Hecht also found important Hamilton's testimony that she would have continued working at DCAS had she not been "laid off." (<u>Id.</u>; <u>see id.</u> at 27-28).

D.    <u>Appeals Council</u>

Following ALJ Hecht's decision, Hamilton submitted to the Appeals Council additional medical records from Lenox Hill Hospital, for the period March 14, 2007, through February 9, 2009.  (<u>Id.</u> at 1, 4-5, 435-40).  On October 29, 2010, the Appeals Council denied Hamilton's request for review of ALJ Hecht's decision, stating that the additional evidence was not a basis for altering the ALJ's ruling.  (<u>Id.</u> at 1-2).

III.    <u>Applicable Law</u>

    A.    <u>Standard of Review</u>

       Under Rule 12(c), judgment on the pleadings is appropriate when the material facts are undisputed and a party is entitled to judgment as a matter of law based on the contents of the pleadings.  <u>See</u>, <u>e.g.</u>, <u>Sellers v. M.C. Floor Crafters, Inc.</u>, 842 F.2d 639, 642 (2d Cir. 1988); <u>Carballo ex rel. Cortes v. Apfel</u>, 34 F. Supp. 2d 208, 213-14 (S.D.N.Y. 1999).

       The Act, in turn, provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g); <u>see</u> <u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Perez v. Chater</u>, 77 F.3d 41, 46 (2d Cir. 1996).  The term "substantial" does not require that the evidence be overwhelming, but it must be "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971) (quoting <u>Consol. Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938)).

       A district court is not permitted to review the Commissioner's decision <u>de novo</u>.  <u>Halloran v. Barnhart</u>, 362 F.3d 28, 31 (2d Cir. 2004) (citing <u>Schaal v. Apfel</u>, 134 F.3d 496, 501 (2d Cir. 1998)); <u>Jones v. Sullivan</u>, 949 F.2d 57, 59 (2d Cir. 1991).  Thus, the court's inquiry is limited to ensuring that the Commissioner applied the correct legal standard and that his decision is supported by substantial evidence.  <u>See</u> <u>Hickson v. Astrue</u>, No. CV-09-2049 (DLI) (JMA), 2011 WL 1099484, at *2 (E.D.N.Y. Mar. 22,

2011).  When the Commissioner's determination is supported by substantial evidence, the

decision must be upheld, "even if there also is substantial evidence for the plaintiff's

position."  Morillo v. Apfel, 150 F. Supp. 2d 540, 545 (S.D.N.Y. 2001).

      B.    Duty to Develop the Record and the Treating Physician Rule

      "Before determining whether the Commissioner's conclusions are

supported by substantial evidence, . . . [a court] must first be satisfied that the claimant

has had a full hearing under the regulations and in accordance with the beneficent

purposes of the Social Security Act."  Moran v. Astrue, 569 F.3d 108, 112 (2d Cir. 2009)

(internal quotation marks, ellipsis, and brackets omitted).  Accordingly, an ALJ's failure

to develop the record adequately is an independent ground for vacating the ALJ's

decision and remanding the case.  Id. at 114-15.  An ALJ thus has an affirmative duty to

develop the administrative record before making a determination regarding a disability

claim.  Perez, 77 F.3d at 47.  Although the duty to develop the record fully is heightened

when a claimant is proceeding pro se, the duty attaches even when a claimant, such as

Hamilton, has counsel.  Moran, 569 F.3d at 112.

      The ALJ's duty to develop the record "works in tandem with the so-called

'treating physician rule,' which requires the ALJ to give controlling weight to the opinion

of a claimant's treating physician if the opinion is well supported by medical findings and

is not inconsistent with other substantial evidence."  Rosado v. Barnhart, 290 F. Supp. 2d

431, 438 (S.D.N.Y. 2003) (citing 20 C.F.R. § 416.927(d)(2)).  The Commissioner,

however, need not grant "controlling weight" to a treating physician's opinion as to the

ultimate issue of disability, as this decision lies exclusively with the Commissioner.  See

20 C.F.R. § 404.1527(e)(1); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("treating

physician's statement that the claimant is disabled cannot itself be determinative").

Nonetheless, the Commissioner must provide "good reasons" for the weight, if any, he

gives to a treating source's opinion, even when the opinion goes to the issue of disability.

20 C.F.R. § 404.1527(d)(2); Snell, 177 F.3d at 133-34 (citing Schaal, 134 F.3d at 505).  If

the ALJ fails to apply the correct standard in weighing a treating physician's opinion or

fails to give good reasons for rejecting the opinion, a remand for further fact finding is the

appropriate remedy.  Halloran, 362 F.3d at 33; Dudelson v. Barnhart, No. 03 Civ. 7734

(RCC) (FM), 2005 WL 2249771, at *7 (S.D.N.Y. May 10, 2005) (citing Schaal, 134 F.3d

at 506).

     C.    Disability Determination

     The term "disability" is defined in the Act as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C.

§ 416(i)(1)(A).  "[W]hether a claimant is disabled or unable to work is a matter reserved

for the Commissioner."  Rodriguez v. Astrue, No. 02 Civ. 1488 (BSJ) (FM), 2009 WL

1619637, at *16 (S.D.N.Y. May 15, 2009) (citing 20 C.F.R. § 404.1527(e)).  In

determining whether a claimant is disabled, the Commissioner is required to apply the

five-step sequential process set forth in 20 C.F.R. § 404.1520. The Second Circuit has

described that familiar process as follows:

> First, the [Commissioner] considers whether the claimant is
> currently engaged in substantial gainful activity. If he is not, the
> [Commissioner] next considers whether the claimant has a
> "severe impairment" which significantly limits his physical or
> mental ability to do basic work activities. If the claimant suffers
> such an impairment, the third inquiry is whether, based solely on
> medical evidence, the claimant has an impairment which is
> listed in Appendix 1 of the regulations. If the claimant has such
> an impairment, the [Commissioner] will consider him disabled
> without considering vocational factors such as age, education,
> and work experience. . . . Assuming the claimant does not have
> a listed impairment, the fourth inquiry is whether, despite the
> claimant's severe impairment, he has the residual functional
> capacity to perform his past work. Finally, if the claimant is
> unable to perform his past work, the [Commissioner] then
> determines whether there is other work which the claimant could
> perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (quoting Berry v. Schweiker, 675 F.2d

464, 467 (2d Cir. 1982)); accord Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008).

The claimant bears the burden of proof with respect to the first four steps of

the five-step process. DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998). If the

Commissioner finds that a claimant is disabled (or not disabled) at an early step in the

process, he is not required to proceed with any further analysis. 20 C.F.R.

§ 404.1520(a)(4); Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 1999).

In assessing whether a claimant has a disability, the factors to be considered

include: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such

facts; (3) subjective evidence of pain or disability testified to by the claimant or other[s];

and (4) the claimant's educational background, age, and work experience." Rivera v.

Harris, 623 F.2d 212, 216 (2d Cir. 1980) (internal citations omitted). Although the ALJ is

required to follow the five-step sequential analysis and consider the above factors in

making the disability determination, he need not state explicitly his reasoning for each

step of the analysis. "[T]he absence of an express rationale for an ALJ's conclusions does

not prevent [a court] from upholding them so long as [the court is] 'able to look to other

portions of the ALJ's decision and to clearly credible evidence in finding that his

determination was supported by substantial evidence.'" Salmini v. Comm'r of Social

Sec., 371 F. App'x 109, 112 (2d Cir. 2010) (quoting Berry, 675 F.2d at 469).

IV.     Analysis: ALJ's Application of the Standard

              The question presented by the cross-motions is whether the ALJ's decision

is legally correct and supported by substantial evidence. Hamilton seeks vacatur and

reversal of the ALJ's decision, as well as remand for additional administrative

proceedings, on the grounds that the ALJ "improperly rejected the opinion" of her

treating physician, "improperly substituted his own lay interpretation" of a radiologist's

report, and failed to consider the need for, and effects of, her medication. (Pl.'s Mem. at

1). The Commissioner disputes each of these assertions, maintaining that the ALJ applied

the appropriate legal standard for determining disability under the Act and that his finding

is supported by the evidence. (Comm'r's Mem. at 1).

A.    First Step

The first step of the sequential analysis requires the ALJ to determine whether the claimant has engaged in substantial gainful activity during the period at issue. 20 C.F.R. § 404.1520(a)(4)(i).  In that regard, ALJ Hecht determined that Hamilton had not engaged in substantial gainful activity since June 1, 2006, the date of the alleged onset of her disability.  (Tr. 15).  This finding of course benefitted Hamilton and is consistent with the evidence, which indicates that Hamilton was employed as an application clerk for New York City from July 2000 to May 2005, and again from September to December of 2006, but has not worked since that time.  (Id. at 26-28).

B.    Second Step

The second step of the sequential analysis requires the ALJ to assess the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  An impairment is severe if it significantly limits the claimant's physical or mental ability to perform basic work activities.  Id. § 404.1520(c).  The ALJ does not consider the claimant's age, education, or work experience at this step.  Id.

At Step Two, the ALJ first determined that Hamilton's high blood pressure, chest pain, heart palpitations, knee pain, depression, back pain, and headaches constituted severe impairments.  (Tr. 15).  The ALJ's findings with regard to Hamilton's conditions also benefitted her since they allowed her to proceed to Step Three.

31

C.    Third Step

The third step calls for the ALJ to determine whether the claimant has an

impairment listed in Appendix 1.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ is required to

base this determination solely on medical evidence, without regard to the claimant's age,

education, or work experience.  Id. § 404.1520(d).  If the ALJ finds that the claimant has

an impairment that meets or equals a listing in Appendix 1, the claimant is considered

disabled within the meaning of the Act.  Id. § 404.1520(a)(4)(iii), (d).  Here, the ALJ

examined the medical records, giving "special consideration" to listings for

"musculoskeletal disorders" (Appendix 1, § 1.00), "cardiovascular disorders" (Id. § 4.00),

"[n]eurological disorders" (Id. § 11.00), and "mental disorders" (Id. § 12.00), and

determined that Hamilton's condition did not meet or medically equal the listed

impairments in Appendix 1.  (Tr. 15).  Hamilton does not appear to dispute this aspect of

the ALJ's decision.  Moreover, a review of Hamilton's medical history in conjunction

with Appendix 1 confirms that the ALJ arrived at the correct conclusion.

1.    Musculoskeletal Disorders

With respect to Hamilton's lower back, Section 1.04 of Appendix 1 relates

to disorders of the spine, including herniated nucleus pulposus or degenerative disc

disease.  See Appendix 1 § 1.04(A)-(C).  Spinal disorders require evidence of either (a)

"nerve root compression characterized by neuro-anatomic distribution of pain, limitation

of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle

weakness) accompanied by sensory or reflex loss" and, if the injury involves the lower

back, "positive straight-leg raising test;" (b) spinal arachnoiditis, which results in the need to change positions more than once every two hours; or (c) lumbar spinal stenosis, which results in an inability to ambulate effectively.  Id.  To ambulate effectively, a claimant must be able to "sustain [] a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living."  Id. § 1.00(B)(2)(b).

Turning to the first of these alternatives, although Dr. Rho diagnosed Hamilton with "lumbar disc herniation with nerve root compression," (Tr. 431), Dr. Lee found that her "bilateral exiting nerve roots appear[ed] within normal limits," (id. at 372), and Dr. Dym found no compression of the spinal cord.  (Id. at 436).  Furthermore, while Hamilton's physical therapy records show positive straight-leg raising tests and muscle weakness in January 2007, (Tr. 171, 175, 179, 183, 190, 194, 197), the records also reflect improvement following physical therapy.  By the summer of 2007, Hamilton's muscle strength had improved to 4/5 and her straight leg-raise test results were negative. (See, e.g., id. at 272, 290, 304, 307-08, 310, 325-26, 328-29).  Similarly, none of Hamilton's physicians diagnosed her with arachnoiditis.  Finally, although Dr. Dym found mild to moderate stenosis, (id. at 436), Hamilton's ability to walk several blocks and take public transportation constituted substantial evidence that she was able to ambulate effectively.

2.      Cardiovascular Disorders

The conditions identified in Hamilton's medical records potentially relating
to her heart include hyperlipidemia, hypertension, chest pain, mitral valve prolapse, and
palpitations.  In that regard, Section 4.00, et seq., of Appendix 1 contains the listing for
impairments of the cardiovascular system.  See Appendix 1 §§ 4.02-4.12.  Listed
impairments potentially relevant to Hamilton's condition include ischemic heart disease
and recurring arrhythmias.  See id. §§ 4.04, 4.05.  The medical exams completed by Dr.
Priester and Dr. Pasquale, however, did not indicate that Hamilton's conditions met the
requirements of Appendix 1.  Section 4.04 requires that ischemic heart disease be
accompanied by (a) an ischemic episode requiring, or not amenable to, revascularization;
(b) coronary artery disease; or (c) a "sign- or symptom-limited exercise tolerance" at a
"workload equivalent to 5 METs or less" of either depression of the ST segment by at
least one millimeter, ST elevation, decrease in systolic pressure, or documented ischemia
by appropriate medically acceptable imaging.  Id. § 4.04.  There is no evidence in the
record of either an ischemic episode requiring revascularization or coronary artery
disease.  Further, Hamilton performed an EKG exercise stress test, and Dr. Priester
observed a ".9 mm horizontal ST segment depression" at "a peak workload of 6.6
METS," (Tr. 149), rather than the one millimeter depression at 5 METs or less required
by Section 4.04.  Dr. Pasquale's examination of Hamilton revealed "[n]either ST segment
depression nor cardiac arrhythmias" and no evidence of "stress-induced myocardial
ischemia."  (Id. at 332).  Finally, although Hamilton complained of chest pain and

34

expressed the belief that she needed open heart surgery, (id. at 131, 134), there is no medical evidence in the record supporting that belief.

### 3. Neurological Disorders

Section 11.00 of Appendix 1 lists impairments of the neurological system. See Appendix 1 §§ 11.01-11.19.  The only impairment potentially relevant to Hamilton's condition concerns spinal cord or nerve root issues, but Section 11.08 requires lesions on the spinal cord or nerve root tissue, id. § 11.08, and the record lacks any reference to lesions.

### 4. Mental Disorders

Mental disorders are listed as impairments under Appendix 1, Section 12.00.  The impairment potentially relevant to Hamilton's condition is affective disorder, which is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome."  Id. § 12.04.  ALJ Hecht correctly found that Hamilton's "mild restriction of activities of daily living," "mild difficulties in maintaining social functioning," and "moderate difficulties in maintaining concentration, persistence or pace" were insufficient to satisfy the "paragraph B" criteria of Section 12.04.  (See Tr. 16).  Although these mild to moderate symptoms satisfied paragraph A of Section 12.04, they were not "marked," nor were there "repeated episodes of decompensation" of extended duration  (Id.; see Appendix 1 § 12.04).  Further, as the ALJ noted, the evidence "fail[ed] to establish the presence of the 'paragraph C' criteria."  (Id.; see Appendix 1 § 12.04(C)).  There also was no evidence that Hamilton suffered from (a) "[r]epeated

episodes of decompensation" of "extended duration," (b) a "residual disease process," or (c) an "inability to function outside a highly supportive living environment."  See Appendix 1 § 12.04(C).

Thus, because none of Hamilton's impairments met or medically equaled the relevant listings, ALJ Hecht correctly continued to the fourth step of the sequential analysis.

D.    Fourth Step

At the fourth step, an ALJ must determine whether the claimant's impairments prevent her from doing her past relevant work, taking into consideration the claimant's symptoms to the extent that they are consistent with objective medical evidence and other evidence.  20 C.F.R. §§ 404.1520(a)(4)(iv), (e)-(f); 404.1560(b)(2).  In doing so, the ALJ must determine the claimant's RFC, or what the claimant is able to do despite any impairments, while considering relevant medical and other evidence from the case record.  Id. §§ 404.1545(a)(1), (3).  The ALJ's RFC analysis must "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work."  SSR 96-8p, 1996 WL 374184, at *7 (1996).  If the claimant can still perform past relevant work, either as it was or is performed in the general economy, the ALJ must find that the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

As noted above, ALJ Hecht found that Hamilton had the RFC to "perform the full range of sedentary work" as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a) because she had the ability to "sit for 6 hours and stand [or] walk for 2 hours in an 8-hour

workday," and "lift [or] carry 10 pounds."  (Tr. 16).  The ALJ determined that this RFC was consistent with Hamilton's past work as an application clerk, which involved "sitting for most of the time in an 8-hour workday" and did not require her to "lift [or] carry anything as part of her duties."  (Id.).

Hamilton challenges the ALJ's RFC determination on two grounds, alleging that he improperly rejected her treating physician's opinion and failed to consider the impact of her pain medication.  (Pl.'s Mem. at 17-23).

### 1.    Treating Physician Rule

Hamilton contends that the ALJ ran afoul of the treating physician rule by rejecting Dr. Rho's opinion that she suffered from a herniated disc.  (Pl.'s Mem. at 17-20).  Hamilton argues that Dr. Rho's opinion is consistent with other evidence, including Dr. Lee's report (id. at 19 (citing Tr. 372-73)), and the opinion of Dr. Rubinsky, who injected Hamilton with a lumbar epidural steroid to treat what he described as a "herniated nucleus pulposus."  (Id. (quoting Tr. 339)).

Dr. Lee's report, dated March 14, 2007, notes an absence of focal disc herniation at the L3/4 and L4/5 levels, but does not mention herniation of the L5/S1 disc.  (See Tr. 372-73).  Hamilton suggests that by omitting herniation in her description of L5/S1, Dr. Lee purposefully distinguished L3/4 and L4/5, which did not show herniation, from L5/S1, arguing that this supports Dr. Rho's finding of disc herniation.  (Pl.'s Mem. at 19 (citing Tr. 372-73); Pl.'s Reply at 3).  Although Hamilton is correct that Dr. Lee's report does not expressly deny the existence of focal disc herniation in the L5/S1 disc, the

37

absence of such a reference cannot reasonably be read to suggest that the MRI did, in fact, show herniation at that level.  In her report, Dr. Lee provided detail concerning the L5/S1 level, including her notation that there was a "minimal diffuse disc bulge with moderate to severe facet and ligamentous hypertrophy."  (Tr. at 372).  Had Dr. Lee intended to suggest that this indicated focal disc herniation, she easily could have done so.  Hamilton's contention that Dr. Lee's report suggests the existence of herniation in the L5/S1 disc therefore is unavailing.

Hamilton further contends that ALJ Hecht improperly adopted his own "lay interpretation" of the March 2007 MRI scan by determining it showed only "minimal abnormalities."  (Id. at 18, 20; Pl.'s Reply at 1 (quoting Tr. 17)).  This argument also fails.  Dr. Lee's report indicates that L5/S1 shows "minimal diffuse disc bulge," and L3/L4 shows "degenerative changes of the facet minimally contacting" the "left L3 exiting nerve root."  (Tr. 372-73) (emphasis added).  Accordingly, ALJ Hecht's description of the abnormalities as "minimal" was not his own interpretation of the March 2007 MRI, but, rather, his adoption of the physician's language.  Dr. Lee's report consequently supports ALJ Hecht's conclusion that Hamilton did not suffer from disc herniation.

Turning to Dr. Rubinsky's report, the mere fact that his conclusion is consistent with Dr. Rho's opinion is not determinative.  As mentioned previously, even if there is evidence consistent with Dr. Rho's opinion and supporting Hamilton's position, the Commissioner's decision must be upheld as long as there is substantial evidence supporting his determination.  Morillo, 150 F. Supp. 2d at 545.  See McBrayer v.

Secretary of Health & Human Services, 712 F.2d 795, 799 (2d Cir. 1983) (recognizing

that ALJ is permitted to choose between properly submitted medical opinions).

Although an ALJ is not required to accept any single opinion—even that of

a treating physician—as dispositive, the ALJ nevertheless must explain why he chose not

to credit a treating physician's opinion.  Here, the ALJ considered but rejected Dr. Rho's

opinions and provided reasons for doing so.  (See Tr. 18).  First, despite Dr. Rho's note

that an MRI scan supported his diagnosis, (see id. at 429), the ALJ noted that the only

MRI in evidence was the one performed in March 2007, which Dr. Lee determined

showed no herniation.[4]  (Id. at 372-73).  Second, while Dr. Rho reported that he saw

Hamilton on a monthly basis, (id. at 429), there were no records or notes from such

monthly treatments in the record.[5]  (See id. at 18).  Furthermore, Dr. Rho's assertion that

Hamilton could not sit for one hour in an eight-hour workday, (id. at 431), was

contradicted by other evidence in the record, including the report of Dr. Kohn's

consultative examination, in which he determined that Hamilton had no restrictions.  (See

id. at 18, 396).  Hamilton contends that Dr. Kohn's report cannot be considered

---

[4]       Hamilton's attorney submitted the report of a subsequent MRI scan, dated
February 9, 2009, (see Tr. 435-37), after ALJ Hecht issued his decision.  This report, however,
reflected "no significant interval change" from the March 2007 MRI.  (Id. at 437).  The Appeals
Council therefore found that it did not provide a basis for modifying ALJ Hecht's decision.  (Id.
at 1-2).

[5]       Although, in some instances, courts have found that a lack of record evidence
supporting a treating physician's opinion suggests that the ALJ did not satisfy his duty to
develop the record fully, see Rosado, 290 F. Supp. 2d at 440, that does not appear to be the
situation here.  Indeed, Hamilton was represented by counsel during the ALJ hearing, before the
Appeals Council, and in this action.  At no stage was there any suggestion that the ALJ had
failed to compile a complete record.

"substantial medical evidence" to overcome the treating physician rule, because that report neither relied on the March 2007 MRI nor mentioned Hamilton's epidural steroid injections.  (Pl.'s Mem. at 19-20).  This argument is unpersuasive, however, because Dr. Kohn thoroughly examined Hamilton, (see Tr. 392-96), and because, as a matter of law, "the report of a consultative physician may constitute" substantial evidence sufficient to contradict the opinion of a treating physician.  Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983).  As ALJ Hecht noted, there were inconsistencies among the opinions of the treating and examining physicians, and he gave "great weight" to the objective medical evidence.  Accordingly, ALJ Hecht did not violate the treating physician rule in reaching his decision.

2.     Hamilton's Pain Medication

Hamilton further argues that ALJ Hecht failed to follow the proper procedure in his RFC assessment because he did not mention, and therefore the record does not fairly reflect that he considered, Hamilton's prescription for and use of "extraordinarily high doses of Oxycodone."  (Pl.'s Mem. at 23; see Pl.'s Reply at 4).  Although Hamilton contends that the ALJ did not take into account her use of Oxycodone, the record reflects that the ALJ in fact considered her medication, even if he did not expressly mention it in his decision.  As noted above, the ALJ need not expressly address every detail he considered in reaching his decision, provided there is substantial evidence supporting his conclusion.  See Gonzalez v. Apfel, 61 F. Supp. 2d 24, 30 (S.D.N.Y. 1999) ("while the ALJ must set forth with sufficient specificity the facts

40

essential to his decision so that the reviewing court may decide whether the ALJ's determination is supported by substantial evidence, he need not explicitly reconcile every conflicting shred of medical testimony") (internal citations and quotations omitted).

Here, the record reflects that ALJ Hecht in fact considered Hamilton's medication, as required by the Commissioner's regulations.  See 20 C.F.R. § 404.1529(c)(3)(iv).  During the December 11, 2008 hearing, for example, the ALJ specifically asked her whether she had any side effects from the Oxycodone.  (Tr. 33). Hamilton responded: "No, I don't think so; but sometime [sic], I feel drowsy.  But I don't know."  (Id. at 33-34).  When asked whether she had any side effects from two other medications, Atenolol and a diuretic-hydrochlorothiazide combination, Hamilton said she did not think so.  (Id. at 31).  The ALJ also inquired into Hamilton's cholesterol medication.  (Id. at 30).  Furthermore, Hamilton's own treating physician, Dr. Rho, stated that the medications he prescribed did not "have any side effects or limit the patient's activities."  (Tr. 430).  In light of this record, it is clear that the ALJ properly considered Hamilton's medication in reaching his decision.

In sum, ALJ Hecht properly applied the rules of the sequential five-step analysis to conclude that Hamilton was not disabled under the Act, and his determination is supported by substantial evidence.

41

V.      Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings, (ECF No. 16), should be granted, and Hamilton's cross-motion, (ECF No. 18), should be denied.

VI.     Notice of Procedure for Filing of Objections to this Report and Recommendation

The parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a) and (d). Any such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Colleen McMahon and to the chambers of the undersigned at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge McMahon. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

Dated:      New York, New York
            July 23, 2013

                                    _____
                                    FRANK MAAS
                                    United States Magistrate Judge

42

Copies to:

Hon. Colleen McMahon (via hand delivery)
United States District Judge

All Counsel via ECF